IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DIANE A. KARRIKER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )  1:16CV21 |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Diane Karriker ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for Disability Insurance Benefits ("DIB") on June 15, 2010 (Tr. 255-61), alleging a disability onset date of August 1, 1981 (Tr. 255). Plaintiff's date last insured was December 31, 1985. (Tr. 271, 315.) Therefore, the only

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

relevant period in this case is the period from August 1, 1981 through December 31, 1985. Plaintiff's application was denied initially (Tr, 127-31) and upon reconsideration (Tr. 137-39). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 145-46), which was held on July 17, 2012 (Tr. 37-59). On August 3, 2012, the ALJ issued a finding that Plaintiff was not under a disability as defined in the Act at any time from August 1, 1981, through December 31, 1985. (Tr. 103-111.) The Appeals Council granted Plaintiff's request for review, and remanded the case to the ALJ for further consideration of Plaintiff's maximum residual functional capacity and evidence from a vocational expert. (Tr. 116-18.) The ALJ heard the case on remand on June 17, 2014 (Tr. 60-81), and ultimately issued a decision again denying Plaintiff's claim for DIB after finding that Plaintiff was not "disabled" under the meaning of the Act between her alleged disability onset date of August 1, 1981, and her date of last insured of December 31, 1985 (Tr. 21-32). On November 25, 2015, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's 2014 conclusion the Commissioner's final decision for purposes of judicial review. (Tr. 1-5.)

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported

by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

4

step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, Plaintiff was diagnosed with growth hormone deficiency in 1974 at age 18, and a CT scan in 1981 showed a possible pituitary tumor. She underwent a

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

craniotomy in August 1981 followed by radiation therapy. She was thereafter managed on medications to balance her hormone and chemical levels, including cortisone. Plaintiff now contends that she suffered from low energy, fatigue, and headaches which precluded her from working.

In a summary included in the record, counsel for Plaintiff noted that Plaintiff worked full time from 1973-1979, and left her job voluntarily in 1979 after she married. (Tr. at 331.) In 2010, Plaintiff filed applications for disability benefits. Her claim for SSI was dismissed because her resources exceeded eligibility levels, and she does not contest that determination. (Tr. 274-75.) Therefore, only the claim for Title II Disability Insurance Benefits proceeded. However, based on her work history, her date last insured is December 31, 1985. Therefore, her claim in this case is focused on whether she suffered from a disability after the alleged onset date of August 1, 1981, and before the date last insured of December 31, 1985.

With respect to that claim, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" during the period from her alleged onset date of August 1, 1981, through her date last insured of December 31, 1985. (Tr. 24.) Therefore, Plaintiff met her burden at step one of the sequential analysis. At step two, the ALJ determined that Plaintiff suffered from the severe impairments of idiopathic growth hormone deficiency, panhypopituitary, hyperprolactinemia, dysgerminoma, s/p frontal craniotomy, and diabetes insipidus. (Tr. 24.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. 24.) The ALJ then assessed Plaintiff's RFC and determined that Plaintiff:

> had the residual functional capacity to perform sedentary work (lift and carry 10 pounds occasionally and stand and/or walk 2 hours, as defined in 20 CFR 404.1567(a)), except that she was able to sustain attention and concentration for 2 hours at a time. She could follow short, simple (not detailed) instructions and

perform routine tasks, but she was unable to work at a production rate or
demand pace.

(Id.). The ALJ found that Plaintiff had no past relevant work for purposes of step four. (Tr. at 30.) At step five, the ALJ considered the testimony of the Vocational Expert and determined that there were multiple jobs in substantial numbers that a hypothetical claimant of Plaintiff's RFC and vocational capabilities could have performed during the relevant period. (Tr. 30-31.) The ALJ therefore concluded that Plaintiff was not "disabled" during the relevant period from August 1, 1981 to December 31, 1985. (Tr. 25, 31.)

Plaintiff now argues that the ALJ erred by (1) disregarding parts of a treating physician's opinion; (2) failing to include in the RFC a requirement for "two to three additional 5-minute rest breaks" during the workday; and (3) relying on the existence of jobs beyond the parameters of Plaintiff's RFC. For the reasons set out below, the Court finds that the ALJ's conclusions were supported by substantial evidence, and none of Plaintiff's contentions merit remand.

### A. The ALJ Did Not Err by Discounting Part of a Treating Physician's Letter

Plaintiff first contends that the ALJ erred at step three of the sequential evaluation process by not giving controlling weight to all parts of an opinion by Dr. Charles Hammond that was provided to Plaintiff's counsel in a letter dated June 20, 2011. Dr. Hammond was Plaintiff's treating physician during the relevant time period in the early 1980s. In considering Plaintiff's claim, the ALJ reviewed Dr. Hammon0d's treatment records at length. As set out by the ALJ and reflected in the records, in August 1981, Plaintiff underwent surgery followed by radiotherapy, and at a follow-up appointment with Dr. Herbert Wiebe, M.D. on November 18, 1981, Plaintiff indicated that she "fe[lt] well except for complaints of weight gain, lower

7

abdominal bloating and facial puffiness," and Dr. Wiebe reported only minimal side effects from Plaintiff's surgery and radiation treatment, with no complaints of fatigue or headaches. (Tr. 382, 26.) On January 22, 1982, Plaintiff saw Dr. Hammond for the first time and indicated that she felt "well, healthy, and without complaint." (Tr. 390, 26.) Dr. Hammond further noted that Plaintiff's "strength, energy and thyroid symptoms [were] unremarkable." (Tr. 390, 26.) Plaintiff again saw Dr. Hammond on February 23, 1982, and indicated that she "[was] without complaint, fe[lt] well, healthy and stable." (Tr. 394, 26.) In March 1982, Dr. Hammond twice attempted to taper Plaintiff off cortisone medications as part of additional testing, but this resulted in nausea, vomiting, and weakness, and Plaintiff resumed the medication. (Tr. 396, 26.) During a visit with Dr. Hammond on May 4, 1982, Plaintiff indicated that she had "done well" and had "no problems or complaints" regarding the previous five weeks, with the exception of one episode of hypoadrenocorticism symptoms (including fatigue) that Dr. Hammond suspected was caused by "impure cortisone." (Tr. 405, 26). Plaintiff similarly had no complaints in subsequent appointments with Dr. Hammond in November 1982 (Tr. 408, 26) and March 1983 (Tr. 411, 26-27).

Plaintiff returned to Dr. Hammond on June 7, 1983, reporting that she had reduced her dose of cortisone without complications. (Tr. 415, 27.) A follow-up appointment on April 10, 1984, indicated that Plaintiff was doing "exceedingly well" and had no symptoms of headaches. (Tr. 416, 27.) Notes from a follow-up appointment on December 14, 1984, reflect that Plaintiff again reduced her cortisone dosage, and indicated "no specific complaints" to Dr. Hammond. (Tr. 421, 27.) A subsequent appointment with Dr. Hammond on June 17, 1985, indicated that Plaintiff was still "tolerating [her cortisone treatment] well," had no

symptoms and generally had "no complaints." (Tr. 425, 27.) She returned for a follow-up in April 1986, with no symptoms reported, and she was directed to continue her present medication regimen and return in one year. (Tr. 429, 27.)

In June 2011, at the request of Plaintiff's attorney, Dr. Hammond provided a letter setting out Plaintiff's treatment history with him. (Tr. 640-42). The ALJ considered Dr. Hammond's letter in three parts. <u>First</u>, the ALJ considered Dr. Hammond's review of Plaintiff's treatment history. Dr. Hammond noted in the letter that he "began [Plaintiff's] management on January 22, 1982," that post-surgery and radiation, Plaintiff was "started on thyroid and cortisone" and "on these various medications she was stable" with no major complications, that her follow-up was "benign," and that he "continued to follow [Plaintiff] yearly, occasionally more often, with no real change in her status." (Tr. 641.) The ALJ gave "significant weight to this portion of Dr. Hammond's letter, because it is consistent with the treatment notes previously discussed." (Tr. 27.)

<u>Second</u>, the ALJ considered Dr. Hammond's response to Plaintiff's current claims. Dr. Hammond stated in the letter, "I note from your letter that [Plaintiff] dates her termination of working from August 1981 as a result of headaches, fatigue, and a lack of endurance. I suspect all of these were likely present in her, although she did not make any specific complaints about them." (Tr. 641). As to this portion of the letter, the ALJ found as follows:

> As the records show, and as Dr. Hammond pointed out, the claimant never reported these symptoms when she was taking correct dosages of cortisone acetate. The fact Dr. Hammond stated that it was likely these symptoms were present is not enough to establish that she had these symptoms more than 30 years ago. More importantly, Dr. Hammond's speculation alone is not enough to find that these unreported symptoms resulted in her inability to perform work activity at all levels. In resolving a conflict between the objective medical evidence and medical opinion, which present a longitudinal history of the

9

> claimant's complaints and limitations, and the claimant's later subjective testimony that presents a current recollection of these complaints and limitations, I am persuaded that the contemporaneous recordation of those complaints and limitations provided by the objective medical evidence and medical opinion is the more persuasive evidence.

(Tr. 27.) The ALJ therefore gave "very little weight to Dr. Hammond's approximately 30-year retrospective self-admitted 'suspicion' that the claimant's current recall of her symptoms 30 years ago to include 'headaches, fatigue, and lack of endurance' were 'likely' present in her." (Tr. 28.)

<u>Third</u>, the ALJ considered Dr. Hammond's assessment of Plaintiff's ability to work. Dr. Hammond's letter indicated that Plaintiff's conditions would have had "a direct negative impact on her ability to perform full-time work;" however, Dr. Hammond further stated that he believed that Plaintiff would have been able to "perform sedentary work which required minimal lifting and occasional walking and standing without significant interruption." (Tr. 642.) Dr. Hammond noted that "[t]his would vary with the acuteness of her symptoms at that time and the regulation and control of her medications." (<u>Id.</u>) In considering this portion of the letter, the ALJ noted that "Dr. Hammond never stated he felt the claimant was unable to perform any work activity." (Tr. 27.) The ALJ further concluded that "Dr. Hammond's generalized opinion regarding the claimant's ability to perform sedentary work supports the residual functional capacity assessed herein, and I have given it controlling weight." (Tr. 28.)

On appeal before this Court, Plaintiff argues that the ALJ failed to analyze Dr. Hammond's July 2011 letter in accordance with Social Security Ruling ("SSR") 96-2p and 20 C.F.R. § 404.1527(c), better known as the "treating physician rule." The treating physician rule generally requires an ALJ to give controlling weight to the well-supported opinion of a

10

Case 1:16-cv-00021-TDS-JEP   Document 12   Filed 02/23/17   Page 10 of 18

treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, controlling weight may not be given to a treating source's opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in the case record." See Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2; 20 C.F.R. §§ 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

As Social Security Ruling 96-2p further explains, "[i]t is not unusual for a single treating source to provide medical opinions about several issues; for example at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not. Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single

11

source." SSR 96-2p, 1996 WL 374188, at *2; see also Prentice v. Astrue, No. CA-06-385-M, 2008 WL 910058, at *6 (D.R.I. Mar. 31, 2008) (referencing SSR 96-2p and noting that "an ALJ is not required to accept a medical source opinion in its entirety"). When an ALJ declines to assign controlling weight to a medical opinion, she must "'explain in the decision the weight given' thereto and 'give good reasons in [her] . . . decision for the weight.'" Chirico v. Astrue, No. 3:10CV689, 2011 WL 6371315, at *5 (E.D. Va. Nov. 21, 2011) (unpublished) (quoting 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2)). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thomas v. Comm'r of Soc. Sec., No. Civ. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012) (unpublished) (citing Blakely v. Comm'r of Soc. Sec., 581 F.3d 399, 409 (6th Cir. 2009); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011)).

In this case, as described above, the ALJ went through Dr. Hammond's letter in considerable detail, and made clear that she assigned differing weight to various portions of Dr. Hammond's letter. As set out above, the ALJ gave "significant weight" to the portion of Dr. Hammond's letter that described Plaintiff's treatment, as reflected in the medical records. (Tr. 27). The ALJ then gave "very little weight" to Dr. Hammond's "30-year retrospective self-admitted 'suspicion'" that Plaintiff "likely" suffered from headaches, fatigue, and a lack of endurance during the relevant period of impairment. (Tr. 28.) The ALJ pointed out that Dr. Hammond's suspicion was directly contradicted by Plaintiff's medical records (see, e.g., Tr. 390 (noting that, at Plaintiff's January 22, 1982 appointment, Plaintiff's "strength, energy and thyroid symptoms [were] unremarkable"; Tr. 396 (specifically noting that Plaintiff was suffering from "few if any headaches"); Tr. 416 (specifically noting that Plaintiff made no

12

complaints of headaches at her April 10, 1984 appointment)). The ALJ resolved this conflict in favor of the contemporaneous medical records. See Kasey v. Sullivan, 3 F.3d 75, 79 (4th Cir. 1993) (noting that it is the province of the ALJ to resolve conflicts in the evidence). Finally, the ALJ gave controlling weight only to Dr. Hammond's "generalized opinion" regarding Plaintiff's ability to perform sedentary work. (Tr. 28.) The ALJ noted that this opinion, going to the nature and severity of Plaintiff's impairment, was supported by objective medical evidence and was consistent with other medical evidence in the record. (Tr. 28.) Thus, the ALJ analyzed the opinion evidence at length, specified the weight given to various portions of the letter, and explained the reasons for that determination in light of the medical evidence of record. Substantial evidence supports the ALJ's determination.[4]

### B. Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff next contends that the ALJ erred in formulating Plaintiff's RFC by not including a limitation that allowed Plaintiff two to three additional 5-minute breaks. In both the 2012 and 2014 hearings, the ALJ asked a Vocational Expert what jobs existed in the national economy during the relevant time for a hypothetical claimant with the following limitations based on Plaintiff's physical and mental limitations: the ability to only perform sedentary work, with the ability to sustain attention and concentration for two hours at a time, the ability to follow short and simple instructions, and the ability to perform routine tasks with no production rates or demand pace. (Tr. 55-56, 79-80.) These limitations were applied to a

---

[4] Plaintiff's brief also cites to Plaintiff's testimony regarding her symptoms, and Plaintiff contends that her testimony must be credited in light of Dr. Hammond's letter. However, the ALJ addressed the credibility issue at length, relying on a detailed consideration of the medical evidence including Plaintiff's own statements reflected in the medical records. (Tr. 28-29.) Plaintiff does not raise a separate challenge to that credibility determination, and the Court finds that the ALJ's credibility determination is also supported by substantial evidence.

13

hypothetical claimant of Plaintiff's age at the relevant time (age 26-30), education (high school graduate), and with no past relevant work. At each hearing, a different Vocational Expert identified jobs that existed in substantial numbers that a hypothetical claimant with the above limitations and vocational characteristics could perform. In response to further questioning, each Vocational Expert similarly noted that these jobs would likely not be available for a claimant who required an additional two or three 5-minute breaks per day. (Tr. 56-57, 79.) In her 2012 decision, the ALJ included the limitation requiring two or three additional 5-minute breaks per day in determining Plaintiff's RFC (Tr. 106-09). However, that decision was vacated on appeal by the Appeals Council and was remanded for further consideration.[5] (Tr. 116.) Following the 2014 hearing, although the same hypothetical limitation was posed to the Vocational Expert, the ALJ ultimately decided not to include that limitation when determining Plaintiff's RFC (Tr. 28-29).

In the 2014 decision, the ALJ went into detail as to why, upon reconsideration of the record, she did not find a need for Plaintiff to have two to three additional rest breaks per day.

---

[5] As such, the ALJ's decision was not inconsistent with Acquiescence Ruling 00–1(4) and Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999). Under Acquiescence Ruling 00–1(4), "where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period." AR 00–1(4) (S.S.A. Jan. 12, 2000); see also Lively v. Sec. of Health & Human Servs., 820 F.2d 1391, 1392 (4th Cir. 1987) (noting that *res judicata* applies to Social Security disability cases and "prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final"); Albright, 174 F.3d at 477–78 ("To have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that final agency adjudications should carry considerable weight."). However, in this case, as noted above, the prior ALJ determination was vacated by the Appeals Council, and the ALJ's decision, "having been vacated, never became final, and thus the doctrine of res judicata did not apply." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016); see also Batson v. Colvin, No. 7:14–CV–48–D, 2015 WL 1000791, at *7 (E.D.N.C. Mar. 5, 2015) ("Here, Albright and AR 00–1(4) did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination."); Sanford v. Colvin, No. 1:14CV885, 2016 WL 951539, at *3 (M.D.N.C. Mar. 9, 2016) ("[T]he ALJ's prior decision had no preclusive effect on the decision at issue here, as the 2011 decision was vacated and a new hearing was conducted.").

(Tr. 28-29.) In considering this issue, the ALJ noted that she gave very little weight to Dr. Hammond's "suspicion" regarding the effect of Plaintiff's ailments during the relevant period of impairment, and that the medical record evidence cut against the credibility of Plaintiff's testimony as to the extent that her medical condition limited her ability to work. (Tr. 29.) Additionally, the ALJ noted that Plaintiff's medical records from 1981 to the present indicate that Plaintiff's few episodes of excessive fatigue were linked to occasions in which she had not taken her proper dose of cortisone. (Tr. 29.) A disorder which is controllable with medication is not "disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Thus, on remand, the ALJ's determination that Plaintiff would not need two or three additional 5-minute breaks during a workday was supported by substantial evidence.

    C.    <u>Substantial Evidence Supports the ALJ's Determination at Step Five</u>

Finally, Plaintiff challenges the ALJ's conclusion at step five that Plaintiff could perform other work in the national economy. Specifically, Plaintiff contends that the jobs cited by the Vocational Expert are outside of the parameters of the hypothetical posed by the ALJ, and thus do not provide substantial evidence of other work available to Plaintiff during the relevant time.

At the 2014 Hearing, the ALJ asked the Vocational Expert to identify sedentary jobs available for a hypothetical claimant similarly situated to Plaintiff limited to "short, simple instructions, not detailed" and "routine tasks," and that did not require work at a production rate or demand pace (Tr. 77). In response, the Vocational Expert identified the positions of order clerk (DOT 209.567-014), table worker (DOT 739.687-182), and hand sorter (DOT 734.687-082) as jobs which existed in substantial numbers and which a hypothetical claimant

similarly situated to Plaintiff could perform. (Tr. 78-79.) Plaintiff now argues that under the Dictionary of Occupational Titles, the order clerk position requires a General Education Development Reasoning Level 3, requiring an employee to apply "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to deal with "problems involving several concrete variables in or from standardized situations." Plaintiff contends that this requirement is inconsistent with the limitation to "short, simple (not detailed) instructions" and "routine tasks," and that the Vocational Expert failed to explain the apparent conflict.

Having considered this contention, the Court notes that this apparent conflict would potentially require remand if the order clerk position were the only position identified. See Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015); Mullis v. Colvin, No. 1:11CV22, 2014 WL 2257188 (M.D.N.C. May 29, 2014). However, in this case the Vocational Expert identified two other positions, table worker (1,400 jobs in North Carolina) and hand sorter (1,500 jobs in North Carolina).[6] Plaintiff contends, without citation to any legal authority, that the table worker and hand sorter positions, by nature, require a worker to maintain a production pace. (Pl. Br. at 14-15.) However, the Vocational Expert identified these positions as not requiring work at a production or demand pace. In addition, the Dictionary of Occupational Titles provides that:

> Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: . . . when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and

---

[6] At the first hearing, a different Vocational Expert also identified the positions of assembler (DOT 725.687-022) and inspector (DOT 669.687-014).

> is physically demanding of a worker even though the amount of force exerted is negligible.

Dictionary of Occupational Titles Appendix C. The table worker and hand sorter positions are classified by the DOT as sedentary, not light, positions, so there is no apparent conflict between the Vocational Expert testimony and the guidance set out in DOT Appendix C. Finally, the Court notes that these positions have been identified and accepted in multiple other court decisions as sedentary positions for individuals limited to a nonproduction pace, and no conflict with the DOT has been noted. See, e.g., Lowery v. Comm'r, Soc. Sec. Admin., No. SAG-13-1181, 2014 WL 936848, at *3 (D. Md. Mar. 7, 2014) (noting that the position of Table Worker (DOT §739.687-182) is "not performed at production rate pace"); Moore v. Colvin, No. 4:15CV62D, 2016 WL 3211470, at *3 (E.D.N.C. May 4, 2016) (finding available positions as a bench hand/inspector/sorter and table worker for an individual with an RFC limited to "no production-pace or quota-based work"); McKinney v. Colvin, 2016 WL 6127737 (N.D.W. Va. Sept. 19, 2016) (finding available positions as a hand sorter for a claimant with an RFC that included "no strict production quotas"); Pearson v. Colvin, No. 2:14CV26, 2015 WL 3757122, at *24 (N.D.W. Va. June 16, 2015) (identifying positions as a table worker in response to a hypothetical limiting a claimant to "no assembly line and no fast-paced production"). Plaintiff cites nothing to the contrary. Therefore, substantial evidence supports the ultimate step five determination in this case.

17

IV.     CONCLUSION

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #7] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #10] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 23rd day of February, 2017.

/s/ Joi Elizabeth Peake
United States Magistrate Judge